UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SKI BOWL REALTY MEMBER LLC.

           Plaintiff,

-against-

DAVID C. CRIKELAIR and
THOMAS P. DOUGHERTY, JR.,

           Defendants.

**AFFIDAVIT OF THOMAS P. DOUGHERTY, JR.**

Civil Case No. 12-CV-4607
(PGG) (ECF CASE)

---

STATE OF TEXAS    )
             )
COUNTY OF MONTGOMERY )

Thomas P. Dougherty, Jr., being duly sworn, deposes and says:

1. I am a Defendant in this action and a Manager of FrontStreet Mountain Development, LLC ("FrontStreet" or "Company"), a Delaware limited liability company, along with Defendant David C. Crikelair. I am also an Original Member of FrontStreet, and I maintain an ownership interest in the Company. The same applies as well to Defendant Crikelair. I am familiar with the operations of FrontStreet from the time of its organization in March of 2005 through the present day.

2. I submit this affidavit in support of Defendants' motion to dismiss Plaintiff's Complaint for injunctive and declaratory relief.

3. In opposition to Plaintiff's application for preliminary injunction, I previously submitted an affidavit dated July 20, 2012, describing the formation and purpose of FrontStreet; the terms and conditions of the LLC operating agreement at issue; and the relevant events surrounding this action. I respectfully request the Court reference

that affidavit for additional information and background in reviewing Defendants' motion to dismiss.

4. FrontStreet was formed in 2005 by a number of investors (the "Original Members") looking to participate in the opportunity to acquire and develop property in North Creek, Warren County, New York (the "Property") adjacent to Gore Mountain. The plan was, and has remained, to create a ski and golf resort with townhouses, hotels, condos, single family homes, restaurants, retail establishments, and other associated recreational developments. FrontStreet was operated pursuant to an Operating Agreement dated March 8, 2005 among the initial investors. The Operating Agreement was individually signed by each Original Member, and, as with all operating agreements for limited liability companies, set forth the individual rights and obligations that each member accepted.

5. The Original Members did not invest in FrontStreet solely for the purpose of making a profit on the sale of lots once the Property was subdivided. They were also interested in investing in and profiting from the development of the Property, through the creation of the ski and golf resort, the townhouses, hotels, condos, single family homes, restaurants, retail establishments, and other potential opportunities. All of the Original Members, including Mr. Crikelair and I, received a percentage of membership interest in FrontStreet based upon the amount of capital contributions. This meant the Original Members would be entitled to receive cash distributions, made proportionate to each member's membership interest shares, of available funds on a quarterly basis from the profits derived from developing the Property.

6. The initial capital contributions of the Original Members, which were in excess of $3 million (*see* Exh. 1, Schedule B) were used, among other purposes, to purchase the Property and fund all costs directly related to the acquisition; formulate, in consultation with third party professional land use planners, a Master Conceptual Plan for the development of the Property; and secure approval of the Master Conceptual Plan from all relevant government authorities. My references to exhibits are to those attached to the Declaration of Jeffrey Pisano.

7. The Original Members recognized that additional capital contributions would be required for the development of the Property under the proposed Master Conceptual Plan. Therefore, in August 2005, FrontStreet created a Project Overview of the development plans of the Property to be circulated to new potential investors in FrontStreet. The Project Overview set forth that FrontStreet would control the townhouse, condominium and single family homes projects outlined in the Master Conceptual Plan to preserve the Original Members' investment opportunity in the development of the Property, and the other planned projects would involve specific developers and investors that specialize in such projects.

8. FrontStreet entered into negotiations with representatives of J.P. Morgan Investment Management, Inc. ("J.P. Morgan") for the sale and transfer of an interest in FrontStreet to J.P. Morgan's designee, Ski Bowl Realty Member LLC ("Ski Bowl"), a Delaware limited liability company, in exchange for cash and other considerations.

9. On June 23, 2006, the Amended and Restated Limited Liability Agreement of FrontStreet Mountain Development, LLC (the "Agreement") was entered

into among Ski Bowl and all of the Original Members individually. *See* Exh. 1, at *1. Each party reviewed and executed the Agreement in their individual capacities. *Id.*, at 57-61. Neither Mr. Crikelair nor I signed the Agreement on behalf of anyone other than ourselves. The Members' investment shares were redistributed based on the initial cash contributions of the Original Members. *See* Exh. 1, Schedule B.

10. What is at issue in this case is whether, as they believe they did, the Original Members reserved the investment opportunity in development of three of the thirteen designated projects on the Land (the Townhouse, Condominium Hotels and Hudson Lodge projects, collectively the "Projects") when they agreed to allow J.P. Morgan to buy-in, and if they wanted to, buy-out.

11. The identified purpose of FrontStreet under the restated Agreement was "to sell the Property to Vertical Improvements LLCs upon the terms set forth in the Agreement or to third-party developers upon the most favorable terms to the Company." *See* Exh. 1, at *13. The Original Members reserved the investment opportunity under Section 10.10 of the Agreement by controlling the right to invest in Vertical Improvements LLCs acknowledged as the developers of the Projects on the Property and by defining upfront the prices at which FrontStreet would be required to sell portions of the Property to the Vertical Improvements LLCs. *See* Exh. 1, at *43-44, Exh. D.

12. In September of 2006, the Original Members invoked their contractual right to invest in The Hudson Lodge Company LLC ("THLC"), the Vertical Improvements LLC formed to develop the Hudson Lodge project. The operating agreement was sent to the Original Members and others who indicated interest in

4

investing in the project. Each Original Member made his or her own investment decision, and not all joined in that project. Mr. Crikelair and I did, and, like the other investors, we and they signed individually onto that agreement. The total capital committed by the Original Members for this Hudson Lodge project was $2.5 million.

13. In October of 2007, the Original Members again invoked their right to invest in FrontStreet RealtyOne, LLC ("FSRO"), the Vertical Improvements LLC formed to develop the initial phase of the Townhouse project. Since that time and to this day, FSRO has invested significant amounts of its available cash for engineering and architectural plans and for the construction of a model Townhouse unit for sale.

14. As I believe the Court can see, the issue of whether the Original Members agreed to forfeit their investment opportunity, and the capital they have already committed, by agreeing to let Ski Bowl out of the Agreement if it chose not to continue as a Member of FrontStreet, is of critical importance to each and every one of the Original Members. It is our position, that by specifying in Section 10.10 that Vertical Improvements LLCs "shall" be the developers of the three defined Projects out of the total of thirteen "Vertical Improvements" listed in the definitions section of the Agreement, the Original Members did secure for themselves the exclusive benefit of the right to invest in the Vertical Improvements LLCs and the potential profits from those Projects. But whether we are right or wrong on this, which a court will determine, is the issue that each and every Member has a substantial and personal interest in.

15. On behalf of myself and Mr. Crikelair, we seek to dismiss the Complaint because Ski Bowl has failed to join FrontStreet and the Original Members as necessary parties in this lawsuit and has commenced this action in an improper venue.

16. As to diversity, we respectfully submit that as the owner of the Property in question, FrontStreet needs to be made a party, since its title to the Property is being affected, and it would have to sign any deed and related documents. If there is any litigation over the sale, such as a boundary dispute or claimed misrepresentations, FrontStreet would be sued. Or, if the buyer failed to fully perform, FrontStreet, as the seller, would be the Plaintiff. It seems inconceivable to me that FrontStreet can be forced to sell its assets under specific terms and conditions as a result of a lawsuit in which it has not been named as a party.

17. Second, FrontStreet must be a party because Ski Bowl's claims are derivative in nature. The only injury alleged is that Defendants' actions have deprived Ski Bowl of the right to a Forced Sale of the Property under certain terms and conditions, which it argues will have a negative impact on its financial investment, for which money damages is the indirect injury and remedy. This alleged injury only accrues because Ski Bowl has an ownership interest in FrontStreet, which entitles it to distributions from the sale of the Property. What amounts Ski Bowl would actually receive in distributions, and when, are dependent upon the terms of sale of the Property, FrontStreet's satisfying all obligations and its meeting the terms of the Operating Agreement. No one can say at this time what the actual distribution to Ski Bowl will be. The only thing that can be said is that Ski Bowl gets no direct payment. It will be paid, no differently than the other

6

members, according to the terms of FrontStreet's Operating Agreement when distributions are made. *See* Exh. 1, at *31.

18. Furthermore, FrontStreet must be a party because there is disagreement among its members. Ski Bowl is a member, as are the other Original Members and Mr. Crikelair and I. Under those circumstances, FrontStreet needs to protect its own interests. It is a legal entity, with legal responsibilities that are incumbent upon it to protect. It has legal liabilities if transactions are carried out in violation of the Operating Agreement, or in contravention of Members' rights.

19. Similarly, FrontStreet must be a party because Ski Bowl alleges that Mr. Crikelair and I have a conflict of interest with FrontStreet and the other Original Members. Ski Bowl claims that we are acting out of our own self-interest. However frivolous that accusation may be, we believe that it mandates that FrontStreet be joined as a party. Ski Bowl will attempt to prove its allegations, and Defendants intend to disprove them. Which one of us is therefore representing the interests of FrontStreet? This is particularly confusing for Ski Bowl to allege, since it is suing Mr. Crikelair and me in our representative capacities as Managers of FrontStreet, not in our individual capacities. By suing us for our actions as Managers, and seeking to direct how we act as Managers of FrontStreet, Ski Bowl recognizes that the real party in interest is FrontStreet.

20. I understand that with respect to an LLC, for diversity purposes, it is the citizenship of the members that controls, not the place of organization of the LLC. I further understand that where there are multiple layers of LLC's, the plaintiff must peel back those layers and disclose the ultimate parties in interest. Ski Bowl represents that its

7

sole member is Excelsior II LLC, an investment fund. *See* Declaration of Jeffrey Pisano. Ski Bowl has disclosed that the members of Excelsior II are citizens of New York and Wisconsin. FrontStreet, like Ski Bowl, includes members who are New York residents, and as such would defeat diversity. *See* Exh. 1, Schedule A.

21. The Original Members also need to be named as parties because the Original Members are individual signatories of and parties to the Agreement under which Ski Bowl seeks a declaration from the Court. Each Original Member made a personal investment in FrontStreet and owns a percentage of the Company based upon his or her capital contribution. This entitles each Original Member to vote on the operations of the Company, as well as enforce and protect their rights under the Agreement. No Member is bound to agree with Mr. Crikelair and myself.

22. The Original Members' investment opportunity is the underlying issue in this action and a decision may result in the extinguishment of this contractual right that the Original Members believe they have, and want to argue that they have. I do not understand how they can be divested of their valuable financial interests and rights in a lawsuit for which they have been purposefully excluded, presumably also so as not to destroy diversity.

23. Further, I understand that Ski Bowl has argued the interests of the Original Members are "seamlessly aligned" with the interests of Mr. Crikelair and myself in defending this action, and therefore, we can adequately represent those interests of the Original Members without their participation. While our actions as Managers of FrontStreet are certainly to promote the interests of its Members, Mr. Crikelair and I are

8

defending against claims that we personally breached duties that we owe to FrontStreet and the other Members. When Ski Bowl alleges as the very basis for the relief that it seeks, that Mr. Crikelair and I have a conflict of interest with FrontStreet and the other Original Members, then Ski Bowl should not be heard to assert that we nevertheless are seamlessly aligned in interest with the other Original Members. In effect, Ski Bowl is claiming that we cannot be trusted to work in their interests, but nevertheless, they have to trust us to do so in order that Ski Bowl can maintain this action in this Court. They cannot have it both ways. Moreover, Mr. Crikelair and I cannot affirm that our interests in this matter are identical to the interests of the entirety of the Original Members or that we are authorized by every Original Member to represent their interests. Nor are we willing to litigate the interpretation of the rights of the Original Members under the Agreement, which has a direct impact on the personal investments of each Member, without advocating for the Original Members' participation in this lawsuit. Therefore, we believe the Original Members participation in this lawsuit is mandatory.

24. As to venue, we respectfully submit that it is improper. Insofar as the Managers are claimed to have communicated with the Original Members about the Offer Notices, or failed to transmit them, the acts or omissions alleged against Mr. Crikelair and me would have occurred in Connecticut and Texas respectively. The negotiations took place over a term of several months primarily by phone and email, rather than in-person with each party representative participating from their respective residences. Furthermore, all activities relating to the Property necessarily occurred in North Creek, New York which is in the Northern District of New York.

25. In August 2011, Mr. Pisano phoned Mr. Crikelair at his home office in Darien, Connecticut to discuss Ski Bowl's wish to force a sale of the Property and liquidate its interest in FrontStreet pursuant to Section 10.3(a) of the Agreement. Thereafter, Pisano mailed a purported Offer Notice ("First Offer Notice") dated September 9, 2011, to Mr. Crikelair and me, as Managers, to the addresses set forth under Schedule A of the Agreement. *See* Exh. 2.

26. As Managers, we notified other Original Members of the Offer Notice by email on October 11, 2011 from our respective residences and discussed the content of the Offer Notice with other Original Members by phone.

27. I prepared a response dated October 21, 2011, on behalf of the Original Members, from my home office in Houston, Texas, objecting to the purported Offer Notice because it did not include material terms and conditions of the sale and requested that Ski Bowl supply a new, properly constituted Offer Notice that fully addressed the objections. *See* Exh. 3.

28. Mr. Pisano acknowledged the error, in part, and withdrew the First Offer Notice by cover letter dated November 7, 2011, accompanied by a revised Offer Notice ("Second Offer Notice"), that was mailed to Mr. Crikelair and me, as Managers, to the addresses set forth under Schedule A of the Agreement. *See* Exh. 4.

29. I prepared a response dated December 20, 2011, on behalf of the Original Members, from my home office in Houston, Texas, objecting to the purported Offer Notice as invalid because it did not include material terms and conditions of the sale. *See* Exh. 5.

30. On January 25, 2012, Pisano mailed another revised Offer Notice ("Third Offer Notice") to Mr. Crikelair and me, as Managers, to the addresses set forth under Schedule A of the Agreement. *See* Exh. 6.

31. I prepared a response dated March 8, 2012, on behalf of the Original Members, from my home office in Houston, Texas, objecting to the purported Offer Notice as invalid because it did not include material terms and conditions of the sale. *See* Exh.7.

32. Thus, there are virtually no ties to the Southern District of New York with regard to the claims for breach of covenant of good faith and fiduciary duty, and the substantial acts or omissions alleged against Mr. Crikelair and me would have occurred outside the Southern District of New York.

33. Insofar as, this is an action over the Original Members' contractual rights and what interest can be included with a sale of property in Warren County, New York — i.e., can FrontStreet sell just the Property in North Creek, or also the development rights in the Property -- I respectfully suggest that this action is properly brought in Supreme Court, Warren County, and not in federal court on a false diversity claim, in a District that has no significant connection to the alleged wrongdoing.

34. For all of the above reasons, the motion to dismiss should be granted.

_____
Thomas P. Dougherty, Jr.

Sworn before me this 10TH
day of September, 2012

_____
Notary Public

ROY L. EGGENBERGER
Notary Public
STATE OF TEXAS
My Comm. Exp. April 7, 2015